IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TROY STOIK,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                  18-cv-699-wmc

CANDACE WHITMAN and DR. CHARLES
LARSON,[1]

                    Defendants.

        *Pro se* plaintiff Troy Stoik, an inmate in the custody of the Wisconsin Department
of Corrections ("DOC"), was granted leave to proceed on an Eighth Amendment deliberate
indifference claim against defendants Candace Whitman and Dr. Charles Larson, both
employees of the DOC working at Fox Lake Correctional Institution ("Fox Lake").  More
specifically, Stoik claims defendants failed to provide appropriate medical treatment for
his arthritis, bursitis and tennis elbow.  (4/1/19 Op. & Order (dkt. #9).)  Before the court
is defendants' motion for summary judgment.  (Dkt. #36.)  For the reasons that follow,
the court will deny defendants' motion.  Also before the court is plaintiff's renewed motion
for assistance in recruiting counsel and appointment of medical expert.  (Dkt. #45.)  The
court will deny that motion, finding that the trial in this case does not exceed plaintiff's
ability and expert opinion is not required given the nature of the parties' dispute.  Finally,
the court resets pretrial deadlines and reschedules the trial as set forth in the order below.

---

[1] The court notes that in its screening order and on the docket defendant's name is spelled Larsen.
The correct spelling is Larson.  The clerk's office is directed to correct his name on the docket as
well.

UNDISPUTED FACTS[2]

## A. Background

Troy Stoik is currently incarcerated at Fox Lake, as he was throughout the period of time relevant to his claims. Since 2006, Dr. Charles Larson was employed by the DOC's Bureau of Health Services ("BHS") as a physician in the Health Services Unit ("HSU") at Fox Lake. Dr. Larson graduated from the University of Minnesota Medical School in 1984, and he has been continually licensed to practice medicine and surgery in Wisconsin since 1985. He began his employment with the DOC in 2002.

In his capacity as a physician at Fox Lake, Dr. Larson is responsible for providing medical services to inmates in accordance with the standards of practice in corrections and community standards, and the BHS policies, procedures, and standards. In general, he attends to the medical needs of inmates, diagnosing and treating illness and injuries, as well as arranging for professional consultation if warranted. Dr. Larson also assists in the supervision of the development and implementation of treatment protocols and patient flow charts.

Since July 26, 2016, Candace Whitman was employed by the DOC as the Health Services Manager ("HSM") at Fox Lake. Before that, Whitman was a nurse clinician at the DOC's Taycheedah Correctional Institution and Dodge Correctional Institution.

---

[2] Unless otherwise noted, the following facts are material and undisputed, viewed in the light most favorable to plaintiff as the non-moving party. In addition to considering plaintiff's opposition to defendants' proposed findings of fact, the court also considered the medical record and other documents attached to his complaint.

Whitman has been continuously licensed as a registered nurse in the State of Wisconsin since 2009.

As HSM, Whitman's duties include the management and supervision of health care services, which in turn involves developing procedures, monitoring care plans, preparing required reports, and providing liaison activities to other disciplines, institution units, and community health care providers. Whitman also is to work with the advanced care providers ("ACPs") in a collaborative manner to provide quality health care in an efficient and effective manner, which include physicians, nurse practitioners/prescribers, and physician assistants.   Finally, Whitman is charged with the HSM providing overall administrative support and direction of HSU, including monitoring documentation in medical records.   Due to the administrative nature of this position, however, the HSM does not evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with an inmate.   Instead, medical care is provided by nursing staff and the ACPs.[3]

## B.  Provision of Health Care to Inmates through HSU

While ACPs can write prescriptions for medications and approve treatment recommendations from offsite providers, HSMs and nursing staff do not prescribe medications or approve treatment recommendations from offsite providers.   Nurses also

---

[3] Plaintiff disputes that Whitman did not provide Stoik with medical care, directing the court to another proposed finding of fact by defendants that Whitman wrote recommendations for physical therapy, and to defendant's exhibit #1000-019, which shows that Whitman signed off on a March 2, 2018, note describing an offsite recommendation from  UW Health Rheumatology.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 19.)  The court takes up this dispute in its opinion below.

have the authority to provide interventions in accordance with nursing protocols, if it is medically indicated.  Appropriate interventions for pain that a nurse could provide include ice therapy, activity restriction, extra pillow, ace wrap, ibuprofen, Tylenol, muscle rub, and education on PRICE measures (protect, rest, ice, compression, and elevation).

When an inmate has a medical concern, wishes to communicate with medical staff, or requests to be seen by HSU staff, he fills out a health services request ("HSR") form and submits it to the HSU.  HSRs are first triaged by nursing staff, including those that are directed to the HSM.  Nursing staff uses their training and judgment in triaging HSRs to prioritize appointments and inmate needs.  An HSR response will typically indicate whether:  the inmate is scheduled to be seen; the HSR is referred to another staff member, or referred for copies or a record review; and whether educational materials are attached. The responder may also provide written comments.  Once nursing staff has triaged and responded to a HSR, it is placed in the inmate's personal request folder portion of the medical record.

When an HSR is determined to be urgent or emergent in nature, arrangements will be made for a same day appointment for evaluation with a health care provider. Additionally, if an inmate has an emergent medical concern, he can inform unit security staff to contact the HSU. Nursing staff can then assess the situation over the phone and provide direction to the security staff.  Emergent requests for medical care should not be communicated through the Inmate Complaint Review System ("ICRS"). The Institution Complaint Examiner ("ICE") is not a medical professional and cannot make treatment

recommendations or decisions for inmates. Reviewing authorities such as the Warden or Security Director likewise defer to the treatment recommendations of treatment providers.

### C. Offsite Referral Process

DOC policy governs how HSU practitioners obtain approval to refer inmates offsite for non-emergent care.  If the physician determines that an inmate has a medical issue that would require him to go off-site to see a specialist or to receive a procedure that cannot be performed at the institution, the physician must submit a Class 3 request to the BHS. (Whitman Decl., Ex. 1001 (dkt. #39-2) ("Division of Adult Institution's Policy 500.30.02").)  The Class 3 request is then reviewed by the appropriate BHS reviewer, typically the Medical Director or Physician Supervisor.  If the Class 3 request is approved, the submitting physician will be notified. The institution's HSU staff will then make an appointment for the inmate to be seen off-site by a consulting physician.

A consulting physician may make recommendations concerning a course of treatment for an inmate. Such recommendations are made to the institution's treating physician.  The treating physician is not bound by the recommendations of the consulting physician or therapist and may adopt or reject any or all of the recommendations in light of the treating physician's own medical judgment and in light of security and other institutional concerns.  Indeed, in consultation with any necessary treating providers outside of the institution, health care professionals employed in the HSU are ultimately charged with providing medical diagnosis, care, and treatment for inmates.

### D. Stoik's Medical Treatment

Defendants represent that Dr. Larson did not see Stoik for medical treatment for arthritis, bursitis or tennis elbow in 2017 or 2018.  Instead, Dr. Larson first saw Stoik on February 11, 2019.  Stoik disputes this, representing instead that he was seen by Dr. Larson "several times," and directing the court to several pages of his medical records, only two of which even mention Dr. Larson.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 25.)  On page 19 of those records, Dr. Larson signed off on two medical notes:  a note dated January 30, 2018, which seeks blood work and hand and foot x-rays, and a note dated March 2, 2018, which describes UW Health Rheumatology recommendations.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 19.)  As defendants explain, however, Dr. Larson would co-sign orders and documents when covering for other physicians at Fox Lake, but his co-signing of the medical record does not mean that he actually *saw* the inmate patient.

Plaintiff also directs the court to a response to an HSR submitted by Stoik dated January 26, 2019, in which the nurse states that he was scheduled to be seen by Dr. Larson on December 17, 2018, but the "Housing Unit called and said you refused appt unless given a ride to HSU."  (*Id.* at 95.)[4]  As discussed more below, these records do not demonstrate that Dr. Larson saw Stoik before February 2019, though there is no dispute that Dr. Larson was at least involved in his medical care in 2017 and 2018.

---

[4] Plaintiff also points to HSRs where he was told that he would see Dr. Larson on December 17, 2018, and after that date passed, that he would see him in January.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 97-98.)

In particular, while plaintiff represents that he saw Dr. Larson on June 23, 2017, the only medical record from that day provided by defendants indicates that he was seen for an audiogram that day, but does not indicate that he had an appointment with Dr. Larson.   Nonetheless, the court notes that defendants did not provide Stoik's entire medical record, and specifically did not provide the page that precedes the June 23, 2017, notation.   Regardless, the court is required to construe all facts in plaintiff's favor as the non-moving party, and, therefore, the court assumes that Stoik saw Dr. Larson on June 23, 2017.   On July 17, 2017, Stoik submitted an HSR indicating that "medication not working, still in pain."   (Compl., Ex. (dkt. #1-7).)   The other records provided by defendants further indicate that Dr. Larson was involved in signing off on various orders. (Whitman Decl., Ex. 1000 (dkt. #39-1) 19 (signing off on January 30, 2018, order seeking blood work and hand and foot x-rays, and a March 2, 2018, order adopting UW Health Rheumatology recommendations).)

On August 2, 2017, Stoik was next seen by Dr. Stelgia for multiple migratory joint pain and a request to be assigned to light duty work.   In the medical record from that day, Dr. Stelgia ordered a consultation with UW Health Rheumatology.[5]   On August 3, 2017, the request for a clinic appointment was faxed to UW Health Rheumatology by a medical

---

[5] The medical record also contains an "Off-Site Service Request and Report."  (Whitman Decl., Ex. 1000 (dkt. #39-1) 7.)  The form seeks a consultation with UW Health Rheumatology for "multiple migratory joint pain" and indicates the appointment date and time of November 10, 2017, 8:00 a.m.  The form further appears to be signed by Charles Larson, M.D., and dated August 15, 2017. The bottom portion of the form contains notes from the November 10, 2017, appointment with Dr. Sara McCoy.  Although far from definitive, plaintiff relies on this form to contend that Dr. Larson saw him and referred him to a specialist.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 30.) Along with his own representations, however, plaintiff has at least created a fact question.

assistant at HSU.   An appointment was then scheduled for November 10, 2017. Defendants explain that off-site appointments are scheduled according to the availability of the off-site hospital or specialist, which varies depending on the specialist's availability.

On September 21, 2017, Stoik submitted an information request, inquiring as to when he would see a rheumatologist, representing that his provider referred him to one three months before.   (Whitman Decl., Ex. 1000 (dkt. #39-1) 111.)   An HSU nurse responded that he had an appointment in November.

On November 10, as scheduled, Stoik had an off-site appointment with UW Health Rheumatology, during which labs and imaging were obtained.   Defendants represent that Dr. McCoy's "recommended plan of care . . . only stated a telemedicine follow-up in twelve weeks."   (Defs.' PFOFs (dkt. #37) ¶ 35.)   This description is incomplete at best and misleading at worst.   Dr. McCoy indicated that her recommendations would be "based on results" of various tests, in addition to recommending a telemedicine appointment in 12 weeks.   (Whitman Decl., Ex. 1000 (dkt. #39-1) 7.)   Plaintiff also directs the court to a March 1, 2018, record from UW Health Rheumatology, indicating that "[h]e did not receive last orders for NSAID or Tylenol," at least giving rise to an inference that Dr. McCoy had recommended use of these non-prescription medications, even if that recommendation was not recorded in the notes provided to Fox Lake.   (Pl.'s Resp. to Defs.'

PFOFs (dkt. #42) ¶ 35 (citing Whitman Decl., Ex. 1000 (dkt. #39-1) 26-27).)[6]

Regardless, in a medical record note dated November 10, 2017, Dr. Stelgia, an RN, and, as best as the court can discern, Dr. Larson signed off on Dr. McCoy's plan to follow-up in 12 weeks.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 20.)  That note, however, contains no reference to medication recommendations, instead stating "[plan of care] based on results" of tests.  (*Id.* at 20.)  Similarly, an order was placed for a telemedicine follow-up in three months, but there is no dispute that there were no medication recommendations in the November 10, 2017, order from UW Health Rheumatology that was provided to the Fox Lake HSU.

On November 15, 2017, Dr. Larson signed another Off-Site Service Request and Report form, requesting a follow-up appointment with UW Health Rheumatology for March 1, 2018.  On January 31, 2018, Dr. Larson also signed off on hand and foot x-rays, as recommended by Dr. McCoy.  (*Id.* at 19.)

On January 14, 2018, Stoik sent an information request, indicating that he "came back from Madison 2 months ago & am waiting for a follow up and new medication, when can I expect to be seen??"  (Compl., Ex. 13 (dkt. #1-13).)  Stoik also stated, "I've been off all medication 6 months & am in pain."  (*Id.*)  An RN responded that same day, "[no] mediations were ordered by UW at your 11/10/17 appointment," and that he had a follow-

---

[6] Plaintiff also directs the court to an August 10, 2018, medical note from UW Health Rheumatology, describing Stoik's medical appointment with Dr. McCoy, stating the results of his tests, and providing that "[t]his was felt to be most consistent with osteoarthritis therefore he was recommended NSAIDs and Tylenol."  (Whitman Decl., Ex. 1000 (dkt. #39-1) 8.)  On their part, defendants also refer to this August 10, 2018, note to describe Dr. McCoy's November 10, 2017, appointment with plaintiff, but this is in error.  (Defs.' PFOFs (dkt. #37) ¶ 39.)

up scheduled in early February 2018.  (*Id.*)  On February 18, 2018, Stoik again submitted an HSR, stating, "I want to see my provider about my ongoing pain.  I haven't been given any medication for 8 months.  I am in unnecessary pain for 8 months now, my options are limited at this point."  (Compl., Ex. 14 (dkt. #1-14).)  Whitman responded, "you have an upcoming appointment with UW-Rheumatology next week."  (*Id.*)

On March 1, 2018, plaintiff was seen by Susan Dondlinger, APNP, at UW Health Rheumatology, and she provided recommendations, including:  (1) starting Naproxen and Tylenol on a daily basis; (2) physical therapy to address hip pain and left lateral epicondylitis; (3) provide tennis elbow strap; (4) evaluate and document joint swelling; and (5) see dermatology to clarify rash.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 26.)  On March 2, Dr. Larson also signed off on Dondlinger's proposed treatment plan, including:  prescribing him Naproxen and Acetaminophen (referred to as "APAP") for four months; referring him to PT; providing him a tennis elbow strap; allowing him to come to HSU for joint swelling to be documented by staff without a co-pay; scheduling him for an appointment with dermatology; and scheduling a follow-up appointment in three months.  (*Id.* at 19.)  Finally, on March 5, 2018, Dr. Larson signed off on another Off-Site Service Request and Report form, requesting a follow up appointment with UW Health Rheumatology, which was scheduled for June 15, 2018.  (*Id.* at 22.)

Plaintiff does not dispute the March 1, 2018, appointment, nor Dr. Larson's signing off on these orders, but contends that he *again* went without medication, an elbow brace and PT for months following that appointment, directing the court to an HSR and medical record note dated May 5, 2018, in which he complained about the lack of medication,

physical therapy and elbow strap.  (*Id.* at 2, 13-14.)  While defendants do not direct the court to any response to Stoik's requests for medication and elbow strap, they point out that a nurse responded to his HSR by explaining physical therapy was backed up, he was on a waiting list, and he would be seen as soon as a spot was available.  (*Id.* at 2.)

On May 13, 2018, Stoik next wrote directly to HSM Whitman, complaining about inadequate medical treatment for his arthritis, bursitis, and tennis elbow.  (*Id.* at 3-4.)[7] Specifically, he stated that the specialist "prescribed medication, but it was not issued to me." (*Id.* at 3.)  Stoik also stated that during his March 2018 follow-up appointment with UW Health Rheumatology, the care provider "confirmed she did prescribe medication and medical orders, this was 2-26-18 at 9AM.  HSU stated it must have been lost.  The specialist re-prescribed the same orders." (*Id.* at 3-4.)   Stoik further stated that he wrote to HSU on May 4, 2018, and asked about the status of these orders, and was told that it would be "several more months before I would be able to receive physical therapy." (*Id.* at 4.)  He then requested that he "would like to get into physical therapy now, not several more months from now.  My pain is active now.  I have been in unnecessary pain for far too long." (*Id.*)

On May 18, 2018, defendant Whitman responded to Stoik's letter, explaining that when he saw UW Health Rheumatology on November 10, 2017, "there were no recommendations for any medications or therapy; the recommendation simply states, 'based on the results above' and that is why nothing was ordered after that appointment."

---

[7] Plaintiff also submitted an inmate complaint, echoing these concerns.  (Compl., Ex. 17 (dkt. #1-17).)

(*Id.* at 5.)   Whitman acknowledged that orders were provided after the March 1, 2018, tele-medicine follow-up and "those recommendations were written and ordered by the [Fox Lake] doctor."   (*Id.*)   Whitman then explained that while Fox Lake offers physical therapy onsite, "there is a waitlist that can be up to 5-6 months long for those with chronic issues." (*Id.*)   Whitman also explained that while those with "surgery or a sudden injury" will be seen on an urgent basis, Stoik did not meet that criteria, a fact he does not dispute at summary judgment.   (*Id.*)

On June 15, 2018, Stoik had another telemedicine appointment with UW Health Rheumatology.   (*Id.* at 23-25.)   The medical provider recommended that he continue with daily Naproxen and Tylenol, and that he "[r]eturn for evaluation in security clinic to determine need for MRI of right hip or sacroiliac joints or further imaging or need for further follow-up in rheumatology."   (*Id.* at 23.)   Stoik's inmate medical record noted these recommendations, and defendants maintain that Dr. Larson signed off on the orders, although the court does not see his signature on this entry.   (*Id.* at 18.)   Even so, there is no dispute that the order was signed off by another medical provider, Carol Radovich, NP. Consistent with the order, an Off-Site Request was placed on June 20, 2018, for Stoik to see UW Health Rheumatology in two months for follow-up, and more specifically, to determine whether an MRI was necessary.   (*Id.* at 21.)   That appointment was then scheduled for August 20, 2018.

On August 7, 2018, NP Radovich ordered Naprosyn 500 mg, #60, to be taken as needed for six months.   (*Id.* at 17.)   On August 10, Stoik had an off-site visit with UW Health Rheumatology, during which the specialist recommended continued use of elbow

brace for tennis elbow and NSAIDs, Tylenol -- "could trial meloxicam or Celebrex," hot compress to address muscle spasms, and "PT when available," but stated that no additional imaging (i.e., MRI) [was] indicated for today and that there was no need to follow-up with rheumatology.  (*Id.* at 21.)  On August 14, Radovich further stopped the Naprosyn order, instead prescribing Meloxicam 7.5 mg as needed for three months.  (*Id.* at 17.)

Stoik also began physical therapy in September 2018 for right hip pain, but was discharged by mid-November.  (*Id.* at 61-64, 71-80.)  On November 7, 2018, Stoik was assessed by the physical therapist, but she felt there was nothing physical therapy could offer that would decrease his pain level.  During physical therapy, however, Stoik was provided with a cane and a TENS unit to address his pain.  On December 18, 2018, Stoik was approved for a cane, wheelchair for distance, and canteen delivery.  (*Id.* at 39.)[8] Defendant Whitman was one of the members of the Special Need Committee who evaluated Stoik's requests.

On February 11, 2019, Dr. Larson saw Stoik for joint pain.  Dr. Larson's notes indicate that he reviewed the records for UW Health Rheumatology, Stoik's medication history and his attempt at PT.  (*Id.* at 42.)  Dr. Larson offered a trial of a bursa injection, but Stoik declined it.  Dr. Larson indicated that Stoik could continue with "D3, Meloxicam, APAP, [wheelchair] for distance, cane and low bunk in the interim," and added "an extra pillow to place under that right knee" and muscle rub.  (*Id.* at 43.)

---

[8] Although plaintiff does not dispute this proposed finding, the document defendants identify in support of this proposed finding shows that Stoik's request for a wheelchair was denied.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 40.)

OPINION

## I.  Defendants' Motion for Summary Judgment

Plaintiff contends that the named defendants, Dr. Larson and HSU Manager Whitman, violated his Eighth Amendment rights by failing to provide appropriate medical treatment for his arthritis and bursitis.  As the court explained in its prior opinion and order granting Stoik leave to proceed on these claims, the Eighth Amendment affords prisoners a constitutional right to medical care.  *See Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  To prove his claim, plaintiff must demonstrate that: (1) he had an objectively serious medical need; and (2) defendants were deliberately indifferent to it.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

At least for purposes of summary judgment, defendants do not dispute that plaintiff suffers from an objectively serious medical need.  Instead, they both seek summary judgment on the basis that:  (1) Dr. Larson was not personally involved in the alleged constitutional deprivations; and (2) Candace Whitman was not deliberately indifferent to Stoik's medical needs.

### A.  Dr. Larson

Defendants contend that Dr. Larson is not liable because he saw Stoik for the first time in February 2019, and before that his only involvement was co-signing orders for other physicians.  (Defs.' Br. (dkt. #40) 14.)  However, as noted above, plaintiff, disputes both of those factual propositions, contending instead that he first saw Dr. Larson on June

14

23, 2017, was not prescribed any medication at that time, and was instead told that Dr. Larson would refer him to a specialist.

Nevertheless, defendants argue that the court should disregard plaintiff's statements, directing the court to *Davis v. Gee*, No. 14-CV-617-WMC, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017), in which this court rejected a bald assertion that there was a conspiracy within the prison involving falsifying medical records as a basis to raise a genuine issue of material fact regarding the plaintiff's medical treatment.  As the court explained, in *Davis*, however, the conspiracy allegations were "based on little more than speculation, which is insufficient to manufacture a genuine issue of fact at summary judgment." *Id.* (citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).   In contrast, the record here does not demonstrate that plaintiff was *not* seen by Dr. Larson on June 23, 2017.  Defendants only submitted what they have deemed to be relevant pages from his medical record, not the entire record.  While defendants submitted a page of that record demonstrating that he saw a nurse for an audiogram on June 23, that entry is on the top of the page, as shown below:



(Whitman Decl., Ex. 1000 (dkt. #39-1) 17.)  And the page *before* this entry, which as far as the court can tell, defendant did not submit, could reveal an appointment with Dr. Larson on that day.  Even if it does not, unlike in *Scott v. Harris*, 550 U.S. 372 (2007) --

another case cited by defendants -- plaintiff's statement that he had an appointment with Dr. Larson on June 23, 2017, is *not* "blatantly contradicted by the record." *Id.* at 380; *see also Davis v. Gripentrog*, No. 18-CV-91-SLC, 2020 WL 416717, at *6 (W.D. Wis. Jan. 27, 2020) (rejecting similar argument that plaintiff's challenge to accuracy of medical records did not raise a genuine issue of material fact).

Defendants only seek summary judgment as to Dr. Larson based on his lack of personal involvement, which the court must reject on the disputed record at summary judgment.[9] If the jury credits Stoik's testimony that he was seen by Dr. Larson in June 2017, complained of pain, and Dr. Larson both refused to order any pain medication and failed to submit a referral to a specialist -- as plaintiff indicates Larson said he would do -- this could form a sufficient factual basis for the jury to find that Dr. Larson was deliberately indifferent to Stoik's serious medical needs. Accordingly, the court denies the motion as to Stoik's claim against Dr. Larson.

## B. HSM Whitman

As to defendant Whitman, defendants seek summary judgment on the basis that a reasonable jury could not find that she was deliberately indifferent to Stoik's serious medical needs. "Deliberate indifference" means that a defendant must have been aware

---

[9] As to both defendants, the Department of Justice also offers its standard, boilerplate qualified immunity defense, which is wholly undeveloped and warrants little need for discussion. *See Sierra-Lopez v. Lamarca*, No. 17-CV-599-WMC, 2020 WL 3574772, at *13 (W.D. Wis. July 1, 2020) (criticizing the DOJ for failing to provide "analysis as to why the defense would be applicable to plaintiff's Eighth Amendment deliberate indifference claim"); *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("Based on our earlier discussion of the law governing deliberate indifference claims, we have no difficulty in concluding that the right to adequate medical care and treatment of conditions of inmates was clearly established at all times during the relevant actions in this case.").

that plaintiff was at a substantial risk of serious harm but failed to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

As best as the court can discern from his opposition brief, plaintiff claims that Whitman was deliberately indifferent to his serious medical needs in: (1) failing to ensure that the pain medication ordered by Dr. McCoy on November 10, 2017, was provided to him; (2) failing to schedule an MRI; and (3) failing to provide PT in a timely fashion. As for the *first* theory, plaintiff claims that he was without medication for approximately eight months from June 2017, when he first saw Dr. Larson until at least March 2018, when he was seen for a follow-up telemedicine appointment with UW Health Rheumatology, and perhaps even until May 2018, when he complained again about the lack of medication. While Stoik blames Dr. Larson for the lack of medication from June 2017 until his appointment with a specialist in November 2017, he appears to blame Whitman for any further delay.[10]

Specifically, Stoik contends that Dr. McCoy ordered medications in November 2017 and that order was misplaced or otherwise disregarded. The undisputed record, however, reflects that in Dr. McCoy's notes to Fox Lake, any recommendations would be "based on results" of various tests, in addition to recommending a telemedicine appointment in 12 weeks. (Whitman Decl., Ex. 1000 (dkt. #39-1) 7.) In other words, Dr. McCoy did *not* communicate any medication recommendations to Fox Lake in the

---

[10] In his complaint, Stoik also complained of the delay between the order referring him to see a specialist, entered in August 2017, and his appointment in November 2017, but defendants have submitted undisputed evidence that the timing of the appointment was outside of their control. Instead, the delay was dictated by UW Health Rheumatology. Regardless, in his summary judgment materials, Stoik does not seek to hold Dr. Larson or Whitman liable for that delay.

November 10, 2017, form.    Perhaps Dr. McCoy communicated medication recommendations to Stoik orally during that appointment, but to demonstrate deliberate indifference on the part of Whitman, Stoik must show that *she* was aware of the need for this medication and ignored it.   The undisputed record does not permit such a finding. Stoik also points to a February 18, 2018, HSR, in which he complained about ongoing pain and the lack of medication for eight months, to which Whitman responded, indicating that he would be seen by UW Health Rheumatology the following week.   (Compl., Ex. 14 (dkt. #1-14).)   In light of his pending appointment with a specialist, and the fact that Whitman was not in a position to prescribe medications, this communication simply cannot form the basis of an Eighth Amendment claim.

Still, after his March 1, 2018, follow-up appointment with UW Health Rheumatology, it appears that Stoik did not receive any medication for at least a couple of additional months.   This, despite the treatment provider expressly recommending that he be started Naproxen and Tylenol on a daily basis at the March 1 appointment *and* Dr. Larson accepting that recommendation the very next day,   Specifically, Stoik complained in a May 5 HSR and in his May 13 letter to defendant Whitman about a continuing lack of medication.   (Whitman Decl., Ex. 1000 (dkt. #39-1) 2-4, 13-14.)   While the nurse who responded to his HSR noted that he was on a waitlist for physical therapy, she did not respond to his inquiry about medication.   (*Id.* at 2.)   Similarly, Whitman stated that there were no recommendations made following his November 2017 appointment, but acknowledged the medication recommendation made in March and also stated that "those recommendations were written and ordered by the [Fox Lake] doctor."   (*Id.* at 5.)

Whitman, however, stopped short of responding to Stoik's complaint that as of May 13, 2018, more than six weeks after his March 1, 2018, appointment he was *still* not receiving medication.  On this record, and in light of Whitman's responsibilities as HSM, the court concludes that a reasonable jury could find that Whitman's failure to ensure delivery of pain medication constitutes deliberate indifference.  As such, the court will deny defendant Whitman's motion for summary judgment as to the denial of pain medication after Dr. Larson signed off on the March 1, 2018, recommendation for the medications.

*Second*, in his opposition, plaintiff complains about the lack of an MRI, arguing "[r]ecords also state that a recommendation for an off-site MRI should be considered." (Pl.'s Opp'n (dkt. #41) 2.)[11]  However, the undisputed record does *not* support a finding that the MRI was recommended by UW Health Rheumatology.  To the contrary, as detailed above, the record reflects that during a June 15, 2018, telemedicine appointment with UW Health Rheumatology, the medical provider recommended that Stoik "[r]eturn for evaluation in security clinic to determine need for MRI of right hip or sacroiliac joints or further imaging or need for further follow-up in rheumatology."  (Whitman Decl., Ex. 1000 (dkt. #39-1) 23.)  Stoik was seen in-person on August 10, and the medical provider indicated that there was no need for an MRI, nor was there a need for Stoik to be seen by UW Health Rheumatology again.  (*Id.* at 21.)  Accordingly, while a refusal to provide an inmate with prescribed medication or follow the advice of a specialist can provide a basis for finding an Eighth Amendment claim, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir.

---

[11] Plaintiff actually blames Dr. Larson for this oversight, but the court will assume that Whitman also could be liable for any failure to address recommendations made by off-site specialists.

2011), the record simply does not permit a reasonable jury from finding that Whitman disregarded a recommendation for an MRI.

*Third*, Stoik contends that Whitman violated his Eighth Amendment rights in light of the lengthy delay -- approximately six months -- between the PT referral and his first visit.  To be fair, plaintiffs pursued this theory in his complaint, but it does not appear to be central to his claim at summary judgment, perhaps because the undisputed record demonstrates that PT proved of no material benefit to Stoik.  Regardless, for completeness's sake, the court also considers this aspect of his claim.  As reflected above, the undisputed record demonstrates that there was a lengthy waitlist for on-site PT.  Whitman explained the reason for the delay and also explained that Stoik's chronic pain condition did not qualify him for emergency PT services.  (Whitman Decl., Ex. 1000 (dkt. #39-1) 5.)  On the undisputed record, the court again cannot find that a reasonable jury could find that Whitman was deliberately indifferent to the specialist's recommendation for physical therapy.[12]

## II. Plaintiff's Motion for Assistance in Recruiting Counsel and Appointment of Medical Expert

In addition to the motion for summary judgment, plaintiff also moves for assistance in recruiting counsel and for appointment of a medical expert who specializes in the treatment of arthritis, bursitis and rheumatoid arthritic conditions.  (Dkt. #45.)  In his

---

[12] In his contemporaneous communications, plaintiff also complained about the lack of the recommended elbow strap, but it appears that at some point, he was provided with the recommended strap, given that the August 10, 2018, note from UW Health Rheumatology recommended its *continued* use.  Regardless, plaintiff does not argue that Whitman was deliberately indifferent to his serious medical needs by failing to provide timely that strap.

20

motion, plaintiff explains that: he is unable to afford counsel; his imprisonment, especially given COVID-19, limits his ability to litigate this case; an attorney would be in a better position to present evidence and cross-examine witnesses at trial; and he had reached out to three attorneys seeking representation and his requests have been denied.  (*Id.*; *see also id.*, Exs. 1-3 (attaching denial letters).)

A *pro se* litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants in finding a lawyer to represent them.  *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007).  A party who wants assistance from the court in recruiting counsel must meet certain requirements.  *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010).  First, he must show that he is unable to afford counsel and that he made reasonable efforts on his own to find a lawyer to represent him.  Stoik has satisfied these requirements.

However, Stoik has not shown that this is one of the relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds the litigant's demonstrated ability to prosecute it.  *Pruitt*, 503 F.3d at 654–55.  "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself."  *Id.* at 655.  Almost all of this court's *pro se* litigants would benefit from the assistance of counsel, but there are not enough lawyers willing to take these types of cases to give each plaintiff one.  Accordingly, the court must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be

the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

Here, plaintiff marshalled his evidence, reviewed defendants' evidence with a critical eye, and formed logical and well-reasoned arguments in response to defendants' motion for summary judgment.  Moreover, the remaining disputes -- whether plaintiff was seen by Dr. Larson on or about June 23, 2017, what transpired during that appointment, and whether HSM Whitman failed to secure pain medication after the March 1, 2018, follow-up appointment with UW Health Rheumatology -- are not complex, nor do they require his calling other witnesses.  Instead, plaintiff's claim will turn on his testimony about the alleged June 2017 appointment with Dr. Larson, the denial of pain medication after the March 2018 appointment with UW Health Rheumatology, and the submission of any evidence that supports his version of events.  Based on his performance to date, the court is confident that plaintiff can represent himself at trial on these factual disputes and arguments of deliberate indifference to his ongoing pain.[13]  Moreover, the court will provide the parties with detailed instructions on how to prepare for trial and how to conduct themselves at trial.

Plaintiff also seeks appointment of a medical expert.  Rule 706 allows a court to appoint a neutral expert when doing so is necessary to help the court or the jury "interpret complex information."  *DeJesus v. Godinez*, 720 F. App'x 766, 772 (7th Cir. 2017).  Here,

---

[13] To the extent that plaintiff has not done so to date, he should request a copy of his full medical record to determine whether there is any record evidence in support of his contention that he saw Dr. Larson in June 2017.  The court notes that discovery closed on September 4, 2020.  Although plaintiff should act promptly in seeking this evidence, the court will also extend the discovery deadline until November 6, 2020, to ensure his ability to do so.

however, the disputed aspects of plaintiff's claim do not turn on whether he suffered from a serious medical need, nor whether Dr. Larson's treatment was so far afield from medically acceptable practices to constitute deliberate indifference, where expert testimony may be required. Instead, as explained above, plaintiff's claim against Dr. Larson depends on his ability to demonstrate that he saw Stoik in June 2017 and disregarded his complaints by failing to provide medication, or otherwise address his complaints of pain, and by failing to refer him to a specialist as he promised. Similarly, his claim against Whitman turns on whether she failed to ensure timely delivery of the ordered medications after his March 2018 appointment with UW Hospital Rheumatology and Dr. Larson's approval the next day. As such, this case is not the type of case where appointment of an expert witness is required. *See Cooper v. McGowan*, No. 17-CV-383-JDP, 2017 WL 6626716, at *2 (W.D. Wis. Sept. 19, 2017) (denying motion where there were no "complex factual questions" requiring expert opinion); *McAdory v. Frank*, No. 14-C-0942, 2016 WL 1677231, at *10 (E.D. Wis. Apr. 26, 2016) (denying motion for appointment of expert witness for straight-forward Eighth Amendment claim).

## ORDER

IT IS ORDERED that:

1) Defendant Dr. Charles Larson and Candace Whitman's motion for summary judgment (dkt. #36) is DENIED.

2) Plaintiff Troy Stoik's motion for assistance in recruiting counsel and appointment of medical expert (dkt. #45) is DENIED.

3) The discovery cutoff is extended to November 6, 2020.

4)  The parties' Rule 26(a)(3) disclosure and motions *in limine* are due November 6, 2020; responses and objections are due November 20, 2020.

5)  The telephonic final pretrial conference will be held at 11:00 a.m. on December 4, 2020.

6)  The trial is rescheduled to commence December 14, 2020 at 8:30 a.m.

Entered this 9th day of October, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24